IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
PROJECT HONEY POT, et al.,      )
                                )
        Plaintiffs,             )
                                )
    v.                          )        1:11cv15 (LMB/JFA)
                                )
JOHN DOES, et al.,              )
                                )
        Defendants.             )
```

MEMORANDUM OPINION

On December 2, 2011, the Court dismissed without prejudice defendants DnB Nord Banka and ZAO Raiffeisenbank ("DnB Nord" and "Raiffeisenbank") for lack of personal jurisdiction, and on April 9, 2012, the Court closed this civil action. Plaintiffs have now filed a Motion to Alter Judgment Dismissing Defendants DnB Nord Bank and Raiffeisenbank [Dkt. No. 128], in which they ask the Court to vacate the Order granting the banks' motions to dismiss, deny those motions, and reopen this civil action. The Court denied plaintiffs' motion in open court on May 11, 2012. This Memorandum Opinion supplements the Court's reasoning already articulated on the record.

I.   BACKGROUND

The complaint alleges that in October 2007, plaintiff John Doe, a resident of Arlington, Virginia, attempted to buy a prescription drug through an online pharmacy called "Canadian Pharmacy." Second Am. Compl. ("Compl.") ¶¶ 21-22. He was

charged for his purchase and paid for it by debit card but received no medication in the mail as promised.  Id. ¶ 24.  Doe suffered no financial loss because his bank credited him the amount charged and assigned him a new debit card number; however, since that transaction, Doe has received voluminous spam email.  Id. ¶¶ 25-26.

Plaintiff Project Honey Pot is a spam-tracking network that "allows spammers, phishers, and other e-criminals to be tracked throughout their entire 'spam life cycle.'"  Compl. ¶ 16. Project Honey Pot claims to have received spam from the online pharmacies associated with the individual defendants or their purported co-conspirators.  Id. ¶¶ 43-44.  In addition to plaintiffs John Doe and Project Honey Pot, the complaint seeks to establish a plaintiff class "of all individuals in the United States who used a debit or credit card to purchase or attempt to purchase medications online at websites controlled by the Pharmacy Defendants, and their card issuing banks."  Id. ¶ 58. Plaintiffs have not moved for class certification.

Plaintiffs have brought this action against two individual defendants located in Russia, Boris Livshits and Andrey Chernuk,[1] who plaintiffs allege operate illegal online pharmacies under

---

[1] In the complaint, plaintiffs refer to Livshits and Chernuk, in addition to "unnamed co-conspirators" with whom Livshits and Chernuk are purported to be conspiring to run illegal online pharmacies, as the "Pharmacy Defendants."  Compl. ¶ 30. Plaintiffs use the term "Pharmacy Defendants" extremely broadly.

various trade names.  Id. ¶ 30.[2]  According to the complaint,
these pharmacies are not licensed to sell prescription drugs, do
not require customers to have a valid prescription, and induce
customers to buy counterfeit medications through false
advertising.  Id. ¶¶ 44, 47.  The conspiracy relies on use of
the Visa card network to obtain payments from customers.  Id.
¶¶ 48-50.  Accordingly, the remainder of the defendants in this
action were six banks based in Europe, Asia, and the Caribbean,
which allegedly "provide[] merchant account card processing
services to the Pharmacy Defendants."  Id. ¶ 31.[3]  Plaintiffs

---

[2] As early as the December 2, 2011 hearing, plaintiffs' counsel
indicated that Livshits may "also [be] a victim in this case"
rather than implicated as an operator of an illegal pharmacy.
See Dec. 2, 2011 Tr. at 13:8-10.  Consistent with this view,
plaintiffs voluntarily dismissed Livshits in March 2012.

[3] Plaintiffs allege that the defendant banks are "acquiring
banks," meaning that they provide credit card processing
services to merchants so that the merchants can accept credit
card payments from customers.  There is no suggestion that the
defendant banks have actually issued the credit cards used by
consumers in the online pharmacy purchases.

The relationship between issuing and acquiring banks has been
described as follows:

   The Visa and MasterCard networks are similar. Issuer
   banks...issue credit cards to consumers. Acquirer
   banks...process payments for the merchants who make
   credit-card sales. When a consumer makes a credit-card
   purchase, the merchant swipes the card, sending a
   message to the acquirer bank. The acquirer bank then
   contacts the issuer bank to determine whether
   sufficient credit exists in the account. If so, the
   issuer bank clears the transaction, relays the message
   to the acquirer bank, which notifies the merchant. On

3

maintain that the banks "are conspiring with other persons and entities to provide merchant account card processing services to the Pharmacy Defendants" and that "[o]n information and belief, the merchant bank that initiated John Doe's transaction is one of the banks specifically named herein, or is another bank conspiring with the Pharmacy Defendants." Id. ¶¶ 27, 38.

The complaint alleges violations of 35 U.S.C. § 292 for false marking, the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962, et seq.), the federal CAN-SPAM Act of 2003 (15 U.S.C. § 7701, et seq.) and the Virginia Computer Crimes Act (Va. Code Ann. § 18.2-152.3:1, et seq.), as well as common law conspiracy, negligence, and unjust enrichment claims.

DnB Nord and Raiffeisenbank, as well as Bank Standard Commercial Bank Closed Joint-Stock Company ("Bank Standard") and Azerigazbank (which are not subjects of the instant motion), filed motions to dismiss for lack of personal jurisdiction and improper service of process. All of the bank defendants were dismissed from this action for lack of personal jurisdiction in

---

a daily basis, the issuer bank forwards payment to the acquirer bank, which deposits the payment into the merchant's account.

Fin. Inst. Track Litig. v. Heartland Bank, No. H-10-171, 2011 U.S. Dist. LEXIS 34953, at *14-15 (S.D. Tex. Mar. 31, 2011).

4

November and December, 2011.[4]  In concluding that there were
insufficient allegations upon which to find personal
jurisdiction over the bank defendants, the Court held that the
complaint raised only implausible, speculative allegations that
the bank defendants had illegally conspired with Livshits and
Chernuk.  The Court further found that a foreign bank's
provision of credit card processing services to a merchant does
not by itself establish a basis for exercising personal
jurisdiction over the bank wherever that merchant's customers
are located, as doing so would essentially eviscerate the due
process guarantees of personal jurisdiction.

Plaintiffs appealed the dismissal of the four banks on
December 19, 2011 without leave of Court, which was required
because the action was still pending against Livshits and
Chernuk.  See Fed. R. Civ. P. 54(b).  Plaintiffs also continued
to pursue third-party discovery regarding the banks for several
months after the banks were dismissed.  On plaintiffs' motion,
the Court dismissed defendant Livshits on March 14, 2012;
however, the civil action remained open because plaintiffs had
not moved to dismiss Chernuk.  On March 29, plaintiffs moved in

---

[4] After the Court granted Bank Standard's, Azerigazbank's, DnB
Nord's, and Raiffeisenbank's motions to dismiss on November 18
and December 2, 2011 respectively, the parties consented to the
dismissal without prejudice of the two remaining banks, St.
Kitts-Nevis-Anguilla National Bank Limited and Rietumu Bank
[Dkt. Nos. 113 and 116].

the Court of Appeals to place the appeal in abeyance pending

final disposition of the district court matter, which motion was

granted on April 3.  On April 9, 2012, the Court sua sponte

dismissed Chernuk due to plaintiffs' failure to effect timely

service, and simultaneously closed this civil action.

## II.  DISCUSSION

A. Standard of Review

   Motions to alter or amend final judgments under Fed. R.

Civ. P. 59(e) may be granted if necessary "(1) to accommodate an

intervening change in controlling law; (2) to account for new

evidence not available at trial; or (3) to correct a clear error

of law or prevent manifest injustice." Pac. Ins. Co. v. Am.

Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998)

(citations omitted).  The power to grant or deny a motion under

Rule 59(e) is discretionary, and "[i]n general reconsideration

of a judgment after its entry is an extraordinary remedy which

should be used sparingly."  Id. (citation and internal quotation

marks omitted).  A motion to reconsider is not a vehicle for

rearguing the law or petitioning a court to change its mind.

See, e.g., Exxon Shipping Co. v. Baker, 554 U.S. 471, 486 n.5

(2008) (explaining that a Rule 59(e) motion "may not be used to

relitigate old matters, or to raise arguments or present

evidence that could have been raised prior to the entry of

judgment") (citation and internal quotation marks omitted).

6

B. Fed. R. Civ. P. 59

In the Second Amended Complaint, plaintiffs allege that the bank defendants are subject to personal jurisdiction in Virginia because they conspired with persons who, among other things, conduct business and cause tortious injury in Virginia.  Compl. ¶ 66.  The complaint provides that the banks "knew or willfully disregarded information showing" that Livshits and Chernuk were illegally offering to sell counterfeit prescriptions online to customers in the United States.  Id. ¶ 76.  This knowledge is purportedly based on Visa's requirement that acquiring banks investigate electronic merchants through a physical inspection of the business and other methods.  Id.  Additionally, plaintiffs claim that most of the online pharmacies' accounts were coded by the bank defendants as pharmacy businesses, thereby triggering additional vigilance obligations by the banks.  Id.  Plaintiffs also allege that Visa required the banks to monitor their merchants' activities, which should have put them on notice of various red flags indicating illegal activity, and that they failed to report this activity to Visa or to law enforcement.  Id. ¶¶ 77-78.

When the banks filed their motions to dismiss, plaintiffs had alleged virtually no facts specific to any particular bank defendant; in fact, DnB Nord and Raiffeisenbank were each specifically named only once in the complaint, with only their

names, addresses, and business structure cited.  Compl. ¶¶ 33-
34.  Accordingly, any allegation that the bank defendants were
engaged in a conspiracy with the individual defendants or other
online pharmacies was entirely speculative and unsupported by
plausible factual allegations.

    Plaintiffs' new evidence purports to show that DnB Nord and
Raiffeisenbank provide credit card processing services to some
online pharmacies.  Specifically, plaintiffs' counsel obtained
from blogger Brian Krebs a stolen dataset of 900,000 sales
transactions for Glavmed, which Krebs identifies as "a Russian
affiliate program that pays webmasters to host and promote
online pharmacy sites...."  See Praed Decl. ¶¶ 2-4 & Ex. E (June
2011 Krebs blog reporting on the dataset).  Counsel represents
that the dataset includes "numerous records tied to Virginia
residents."  Praed Decl. ¶ 4.  Thereafter, counsel issued third-
party subpoenas to domestic banks whose cards were frequently
used in the Glavmed transactions.  Id.  Three of the banks
responded, with the last response received on April 18, 2012.
Counsel represents that he is still awaiting the results of
documents promised by Wells Fargo.

    The banks produced 233 transaction records for the period
from 2006 to 2010.  Id. ¶ 6.  Sixty-three transactions
identified the processing bank, of which 51 named either DnB
Nord or Raiffeisenbank, and the banks are purportedly linked to

an online pharmacy at issue in this action.  Id.  The chain of
evidence plaintiffs have used to make this connection is
somewhat difficult to follow.  Plaintiffs explain that in the
records identifying one of the defendant banks, a merchant name
or domain name is also listed.  Counsel has apparently accessed
some of these domain names, searched the websites for previous
sales, and found that one lists the phone number given to
plaintiff John Doe in the course of his online pharmacy
transaction with "Canadian Pharmacy," which phone number was
also included in the Second Amended Complaint.  Pls.' Reply at
6-7; Compl. ¶ 22.  Counsel has also used the "Wayback Machine,"
an Internet archive website, to view websites of the merchants,
apparently discovering that at the time of the transactions,
some were doing business as "Canadian Pharmacy."  Pls.' Reply at
8-9.

     The banks initially contend that plaintiffs' motion for
reconsideration is untimely, as it was not filed within 28 days
of the December 2, 2011 Order dismissing them from the case.
See Fed. R. Civ. P. 59(e).  Plaintiffs argue that the 28-day
period did not begin to run until the Court's April 9, 2012
final Order closing the action in its entirety.  The Court need
not decide the timeliness issue, because plaintiffs' motion
fails on its merits.  If the December 2, 2011 Order triggered
the 28-day period, plaintiffs' April 23, 2012 motion is untimely

9

by nearly four months.  The Court has no authority to extend the Rule 59(e) time limit.  See Panhorst v. United States, 241 F.3d 367, 370 (4th Cir. 2001).  If the April 9, 2012 date is used, it is entirely clear that the evidence proffered by plaintiffs does not qualify as "new evidence" for purposes of Rule 59(e).  "Evidence that is available to a party prior to entry of judgment" does not justify a motion for reconsideration; the movant must demonstrate both that the evidence was newly-discovered and that the party "could not with reasonable diligence have discovered and produced such evidence" earlier.  Boryan v. United States, 884 F.2d 767, 771 (4th Cir. 1989) (citations omitted).

The first complaint in this lawsuit was filed in January of 2011 and was followed by an amended complaint on May 18, 2011 and a second amended complaint on July 12, 2011.  The "new" evidence now offered by plaintiffs involves transactions which occurred between 2006 and 2010.  Praed Decl. ¶ 6.  Plaintiffs' counsel represents that he has been following blogger Brian Krebs' reporting for "many years," and that Krebs reported in June 2011 that he had possession of the Glavmed dataset that is the source of the new evidence.  Id. ¶ 2.  Counsel does not specify when he received a copy of the dataset from Krebs, other than "[d]uring the pendency of this lawsuit."  Id. ¶ 4.  Regardless, counsel had actual access to the dataset well before

April 9, 2012, because as a result of that data, plaintiffs
issued third-party subpoenas to several domestic issuing banks
and received responses "over the past several weeks," through
April 18, 2012.  Pls.' Mem. at 6.  Plaintiffs simply have not
offered any persuasive explanation for their failure to produce
this evidence before April 9, 2012, one year and three months
after this lawsuit was filed.

Moreover, at the November 18, 2011 hearing at which the
Court dismissed the first two banks, plaintiffs were granted
leave to file a third amended complaint within 14 days.  The
Court admonished counsel that failure to establish a more
meaningful basis for personal jurisdiction over the banks could
justify Rule 11 sanctions.  Plaintiffs never filed another
amended complaint.  Defendants are correct that, because
plaintiffs failed to file a third amended complaint within the
time allotted and have not sought leave to do so in conjunction
with the instant motion, the complaint currently before the
Court is the same one the Court previously considered and deemed
insufficient to establish personal jurisdiction.

Plaintiffs insist that "[n]o amendments to the Complaint
are necessary at this time," and instead argue that "the short
and plain statements in the Complaint are adequate to state a
claim."  Pls.' Reply at 14.  Accordingly, plaintiffs merely
request that the Court change its mind as to the sufficiency of

11

the allegations in the Second Amended Complaint, which
allegations the Court has already rejected as insufficient.
Rule 59(e) "does not provide a party with a mechanism to just
keep filing motions with new theories until it gets it right."
Hanover Ins. Co. v. Corrpro Cos. Inc., 221 F.R.D. 458, 460 (E.D.
Va. 2004).  For all of these reasons, plaintiffs have not met
the standard for new evidence required by Rule 59(e).

   C. Requirements for Personal Jurisdiction

      Even if plaintiffs' proffered evidence qualified as "new"
for purposes of Rule 59(e), this new evidence, if pleaded in the
complaint, would still be insufficient to support a finding of
personal jurisdiction over the banks.  To be subject to personal
jurisdiction, a defendant must have "certain minimum contacts
[with the forum]...such that the maintenance of the suit does
not offend traditional notions of fair play and substantial
justice."  Calder v. Jones, 465 U.S. 783, 788 (1984) (quoting
Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945))
(internal quotation marks omitted).  A court must consider three
factors in determining whether personal jurisdiction is
appropriate over a given defendant: "(1) the extent to which the
defendant purposefully availed itself of the privilege of
conducting activities in the State; (2) whether the plaintiffs'

claims arise out of those activities directed at the State;[5] (3) and whether the exercise of personal jurisdiction would be constitutionally reasonable." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (internal quotation marks omitted).

Plaintiffs claim that jurisdiction over the banks is proper based on a conspiracy theory of personal jurisdiction. Specifically, they allege that the banks process credit card transactions for online pharmacy merchants as co-conspirators and engage in various efforts to conceal the activities of the merchants. Under plaintiffs' theory, because these pharmacies transact business with and send spam to Virginia customers, the banks also have contacts with Virginia through the actions of their co-conspirators.

There are three fatal flaws in plaintiffs' personal jurisdiction argument. First, plaintiffs cannot show that these defendants have had any direct contacts with Virginia. Second, plaintiffs' "new" evidence still does not link the defendant

---

[5] In this case, plaintiffs have asserted only specific jurisdiction, alleging that the basis for jurisdiction over the defendants arises from the conduct at issue in this suit. Based on the paucity of defendants' contacts with the forum, general jurisdiction would clearly be improper, as no plausible claim can be made that the banks' "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in" Virginia. Goodyear Dunlop Tires Operations v. Brown, 131 S. Ct. 2846, 2851 (2011).

banks with Virginia customers, Chernuk, Livshits, or the single transaction at issue in this case.  And finally, even if plaintiffs could show that the banks processed transactions for merchants with Virginia customers, personal jurisdiction would still be improper due to the extremely attenuated nature of the banks' contacts with the forum.

In their original motions to dismiss, defendants DnB Nord and Raiffeisenbank submitted affidavits from bank officials attesting that the banks have no direct contacts with Virginia. Specifically, the DnB Nord official averred that his bank has no offices in Virginia, and neither owns nor leases any property, pays no taxes, and maintains no bank accounts in Virginia. Kairovs Decl. ¶¶ 4, 6, 8 (head of DnB Nord legal department) [Dkt. 73-1].  Of greatest relevance here, the officials for both DnB Nord and Raiffeisenbank stated under oath that the banks do not "solicit or initiate business" in the Commonwealth.  Kairovs Decl. ¶ 9; Kabanov Decl. ¶ 4 (head of Raiffeisenbank legal division) [Dkt. 36-4].  Kairovs of DnB Nord also averred that his bank does not conduct any business activities or have clients in the Commonwealth, nor does it provide credit card processing services for any of the individual defendants or pharmacy merchants identified in the complaint.  Kairovs Decl. ¶¶ 10, 13-14.  Plaintiffs have offered no new evidence showing

14

that the banks had any direct contacts with Virginia or with
Chernuk and Livshits.

Nor does plaintiffs' new evidence establish that the banks
processed transactions for merchants in which the ultimate
customer was located in Virginia. According to plaintiffs'
counsel's declaration, the stolen Glavmed data includes sales
records which "reveal[] numerous records tied to Virginia
residents." Praed Decl. ¶ 4. Yet, there is no indication that
any of the 51 Glavmed transactions allegedly linked with the
defendant banks involved Virginia customers. See Praed Decl. ¶
6.[6] Moreover, plaintiffs still have presented no evidence

---

[6] In support of their theory of personal jurisdiction, plaintiffs
rely on Verizon Online Servs. v. Ralsky, 203 F. Supp. 2d 601
(E.D. Va. 2002), decided a week before ALS Scan, Inc., in which
the court found that out-of-state defendants' transmittal of
spam through Verizon's email servers located in Virginia was
sufficient to establish personal jurisdiction over them. The
court held that the defendants "reasonably should have expected
to be haled into court in Virginia for deliberately exploiting
Verizon's e-mail servers for pecuniary gain while trespassing
Verizon's property." Id. at 616. See also Aitken v. Communs.
Workers of Am., 496 F. Supp. 2d 653 (E.D. Va. 2007) (finding
personal jurisdiction over spammers because "defendant knew or
reasonably should have known that by sending the emails to
Verizon email addresses, their messages would necessarily go to
Verizon servers").

In contrast, unlike the defendants in Ralsky and Aitken, the
complaint in this case does not allege that the defendant banks
were involved in sending spam email messages. Rather, the
banks' only connection to Chernuk and Livshits' alleged spamming
activities is the banks' credit card processing
function. Accordingly, any personal jurisdiction theory based
on spam messages sent to Virginia customers is not viable
against the banks, as any relationship between the banks and the

connecting either of the defendant banks with plaintiff John Doe's credit card transaction through "Canadian Pharmacy."[7] Lastly, Glavmed is neither named as a defendant nor otherwise referenced in the complaint, and the new evidence fails to link Glavmed to either Livshits or Chernuk.  See Compl. ¶ 43 (listing pharmacies allegedly linked with the individual defendants).  In conclusion, the new data does not establish that the defendant banks process transactions involving any Virginia customers, much less for John Doe, nor does it demonstrate any connection between the banks and the only other named defendants in this case, Livshits and Chernuk.

Lastly, as the Court explained during oral argument, the relationship between a bank as transaction processor and the ultimate consumer in Virginia, without more, is far too attenuated to meet the requirements of the Virginia long-arm statute and the federal Constitution's due process guarantee.[8]

---

messages is entirely unsupported by plausible factual allegations.

[7] As discussed above, plaintiffs contend that the new evidence links the defendant banks with some "Canadian Pharmacy" transactions; however, this connection is extremely tenuous and does not indicate that either of the defendant banks processed John Doe's specific transaction.

[8] "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry."  Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009).

It is black letter law that, to be subject to personal
jurisdiction, a defendant must have "purposefully availed itself
of the privilege of conducting activities in the State." ALS
Scan, Inc., 293 F.3d at 712 (internal quotation marks omitted).
Moreover, the "unilateral activity of another party or a third
person is not an appropriate consideration when determining
whether a defendant has sufficient contacts with a forum State
to justify an assertion of jurisdiction." Helicopteros
Nacionales De Colom. v. Hall, 466 U.S. 408, 417 (1984). The
Court recognizes that under a conspiracy theory of personal
jurisdiction, a court may exercise jurisdiction over one
defendant based on the conduct of a co-conspirator in the forum
"in some instances." See Galustian v. Peter, 750 F. Supp. 2d
670, 674 (E.D. Va. 2010). This is true even if the defendant's
only relationship with the forum is through the contacts of a
co-conspirator. Noble Sec., Inc. v. MIZ Eng'g, Ltd., 611 F.
Supp. 2d 513, 539 (E.D. Va. 2009). As explained in Noble Sec.,
Inc., the reasoning underpinning this theory of jurisdiction "is
that a defendant who joins a conspiracy knowing that acts in
furtherance of the conspiracy have taken or will take place in
the forum state has purposefully availed himself of the
privileges of that state and should reasonably expect to be
haled into court there." Id. Even under a conspiracy theory of
jurisdiction, however, a plaintiff must allege facts indicating

17

that the defendant knew (or should have known) that a co-conspirator was acting in the forum state and had a reasonable expectation that it could be brought into court in that state.

The decision of the United States District Court for the Southern District of Texas is persuasive in assessing whether personal jurisdiction is appropriate over acquiring banks.  In Fin. Inst. Track Litig. v. Heartland Bank, No. H-10-171, 2011 U.S. Dist. LEXIS 34953 (S.D. Tex. Mar. 31, 2011), the court found that a Missouri-based acquiring bank was not subject to personal jurisdiction in Texas, when jurisdiction was asserted based solely on the bank's contract with a New Jersey-based credit card processing entity whose processing center was located in Texas.  The court held that "there is no basis to conclude that [the acquiring bank] engaged in a purposeful or affirmative act that would subject it to jurisdiction in Texas." Id. at *46.  It further rejected the plaintiffs' argument that the acquiring bank was subject to jurisdiction in Texas because of its participation in the Visa and MasterCard networks.  Id. at *48-50.[9]

_____

[9] Plaintiffs point to Gucci Am., Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228 (2010), decided under New York law, in which Gucci sued credit card processing companies, including two acquiring banks, based on their provision of services to a website that sold counterfeit Gucci products.  One of the defendants, Durango, helped to link merchants with the defendant acquiring banks and specifically advertised its services for "'High Risk Merchant Accounts,' including those who sell

The purposeful availment standard "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (citation and internal quotation marks omitted). The defendant banks' contacts with Virginia are much too weak and attenuated to meet the Burger King test. Both the banks and the pharmacy merchants are located outside of the United States and there is no evidence that the banks knew that Virginia residents would be targeted by the pharmacy merchants. Moreover, even if the banks did have such knowledge, exercising personal jurisdiction merely because they knew that some of their merchants transact business with Virginia customers or because the banks are members of the global Visa system would essentially subject all acquiring banks to jurisdiction anywhere in the world. Although the advent of complex global financial systems raises interesting questions of personal jurisdiction, "technology cannot eviscerate the

---

'Replica Products.'" Id. at 238. The complaint alleged that Durango knew that the online merchant at issue sold counterfeit Gucci products. Id. at 239. In addition to Durango, the court found personal jurisdiction to be proper over the acquiring banks, due in part to their alleged knowledge that the online merchant sold counterfeit goods and the banks' "operat[ion] of a service that allowed customers from anywhere in the United States, including New York, to purchase goods from websites like [the counterfeiter's]," finding that they had "purposefully availed themselves of this forum." Id. at 245. Gucci is distinguishable from the instant case, because here the defendant banks have no relationship with an intermediary that specifically seeks out "high risk" merchants.

constitutional limits on a State's power to exercise jurisdiction over a defendant." <u>ALS Scan, Inc.</u>, 293 F.3d at 711.  Accordingly, the relationship between the defendant banks, which merely provide credit card processing services to the foreign-based merchants, who in turn advertise their allegedly illegal services over the Internet and ultimately reach customers in Virginia, is far too attenuated to establish personal jurisdiction in this district.

### III.  CONCLUSION

Plaintiffs have failed to show that their proffered evidence is "new" evidence that could support a motion under Rule 59(e), and even on the merits, the new evidence is still insufficient to subject the bank defendants to personal jurisdiction in this Court.  For these reasons, plaintiffs' Motion to Alter Judgment Dismissing Defendants DnB Nord Bank and Raiffeisenbank has been denied.

Entered this 21st day of May, 2012.


Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge